IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

ANTIONE ZENO JONES                                                    PLAINTIFF

v.                                    Civil No. 6:08-cv-06035

SHERIFF LARRY SANDERS;
DEPUTY DUNN; and
CAPTAIN STEED                                                        DEFENDANTS

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

Plaintiff Antione Zeno Jones (hereinafter Jones) filed this civil rights action pursuant to 42 U.S.C. § 1983.  He proceeds *pro se* and *in forma pauperis*.  Jones contends he was subjected to unconstitutional conditions of confinement while he was incarcerated at the Garland County Detention Facility in Hot Springs, Arkansas.  Pursuant to the provisions of 28 U.S.C. § 636(b)(1) and (3)(2007), the Honorable Robert T. Dawson, United States District Judge, referred this case to the undersigned for the purpose of making a report and recommendation.

On March 10, 2010, an evidentiary hearing was held in this case.  One of the witnesses, Charles Waits, who had been subpoenaed, failed to appear.  Jones indicated Waits' testimony was necessary to his case.  For this reason, a show cause order was issued and a supplemental hearing scheduled for April 16, 2010.  Waits appeared at the supplemental hearing.  Jones failed to appear.  The Court questioned Waits on his failure to appear for the April 16th hearing and based on the facts he presented held that Waits was not in Contempt of Court.

Based on Jones' failure to appear for the hearing, the Court held Jones had waived his right to present Waits' testimony.  The Defendants were allowed to present the testimony of Waits.

-1-

## I.  Background

On September 13, 2007, Jones was arrested and booked into the Garland County Detention Facility (GCDF). He remained incarcerated at the GCDF until transferred to the Arkansas Department of Correction (ADC) on April 27, 2008.  *Defendants' Exhibit* 1.

At the evidentiary hearings, the Court heard the testimony of the following witnesses:  (1) Shelby Ingram; (2) Antoine Jones; (3) James Charles; (4) Captain Mel Steed; (5) Deputy Tyson Dunn; (6) J.D. Fladung; and (7) Charles Waits.  The testimony of these witnesses will be summarized  in the first person.

### *Shelby Allen Ingram*

I live in Little Rock.  I was incarcerated in the GCDF from August 28, 2007, until I was transferred to the Arkansas Department of Correction (ADC) on November 13, 2007.  Jones and I were cell-mates for two and one-half months.  I don't know the cell number but it was in cell block 2A.  The entire time the toilet never worked.  When we were locked down, feces and urine would build up in the toilet.  The toilet was flushed once a day at night around bedtime.  We were probably locked down about one-half of the time.

The cell doors were opened each day around 7:30 a.m. or 8:00 a.m.  We were locked down for each meal, for pill call, and for visitation.  We were locked down for the night at about 9:00 p.m.  The rest of the time we could go to the day-room.  When we had access to the day-room, we could go in another cell and use the toilet.

I told Deputy Morphew and Deputy Dunn that I was feeling sick and throwing up in the sink.  The toilet was filled with feces and urine.

Sometimes the bottom of the toilet leaked.  Actually, it was the sink in the cell that leaked.  So there was fresh water on the floor.  The toilet was not leaking. They would give us green blankets to put around the toilet.  To drink from the water fountain you had to lean over the toilet.  I sent in multiple kites about the toilet not working.  No action was taken.

### Antoine Jones

I was incarcerated in the GCDF beginning on September 14, 2007.  The facility was horrible.  In cell block 1-B the toilet leaked.  The bowl had a crack in the side towards the back and was leaking.  The water was not clean; it was feces water.  I slipped and fell pulling a muscle in my back.  Deputy Rima and Deputy Dunn took me to the hospital.

When I shared a cell with Ingram, fresh water was leaking from the sink.  You would smell his feces and urine.  I had to put a blanket over the toilet to stop the smell.  I was never in a cell with a working toilet.

The cells were unlocked between 7:00 a.m. and 8:00 a.m.  At night, we were locked down at 9:00 p.m.  In between, we were locked down for meals, pill call, and if something happened.  Most of the time, we could go in another cell.  The policy was that you couldn't go in another cell without permission.

Officers would come in late at night and put blankets around the toilet.  The toilet was only flushed once a day--at night.  Sometimes they skipped flushing it.  However, most of the time it did get flushed.  It never flushed during the day.   If you went in another cell, and got caught there were problems.  People in the cell didn't want you in their cell "crapping."

I submitted many grievances complaining about the conditions of the cell.  *See Plaintiff's Exhibit 1.*  I was trying to get out of the cell.  I never talked to Steed personally or to Sheriff Sanders personally.  I wrote Lt. McMurrian and told her about the cell.  I talked to guards trying to get out of the cell.  I was just going through the chain of command.

### James Matthew Charles

I'm in the Arkansas Department of Correction at the Ouachita River Correctional Unit.  I have been in custody for two years and eight months.

I was at the GCDF.  I saw Jones' cell.  The toilet was broken and they had to keep water blankets on the floor.  If a toilet was broken, at nighttime, they brought a five gallon bucket of water to flush the toilet.  We all heard Jones complaining about the toilet.  Water from his toilet came into my cell.  There were three

men in Jones' cell. One was on the floor. From 7 a.m. until 9 p.m., we could use the toilet in another cell. During this period of time, we were locked down for meals. Six people had to use the restroom in someone else's cell. At nighttime, they would leave the cell doors open "on local" or unlocked so everyone could use a bathroom. Most of the time, whether it was day or night, you could use the bathroom in another cell.

I was around when Jones slipped and feel. We were all there watching TV. Deputies Waits and Dunn came to get Jones.

### Captain Mel Steed

I work at the Garland County Sheriff's Department. I'm currently the jail administrator. I have held that position for six years. I make sure the jail is maintained and operated in a sanitary and clean manner. Toilet facilities and basins are available. Showers are available and hygiene items are provided.

Sometimes the toilets get stopped up. The officers submit work orders. Normally the officers would just say: "The toilet in cell #___ is not operable." As soon as I've been made aware of an inoperable toilet, I call J.D. Fladung. I then also give J.D. a written work order. He normally responds quickly and takes care of the problem.

The jail was built in 1986. The cells have a stainless steel sink, drinking fountain, and toilet combination. The drinking fountain is on top. To flush the toilet you push a button. The parts are obsolete and sometimes difficult to find. The manufacturer of the units in the GCDF went out of business.

If there is a problem with a toilet, we would try to move the inmate out of the cell. Normally, we leave two cells on local; this means the doors are not locked. The inmates can go in and out. The cells were opened between 7:00 a.m. and 8:00 a.m. The cells were locked down at 9:00 p.m. If a toilet is not working, it is flushed at night when the inmates are locked down. The toilets are flushed using a five gallon bucket of water.

The problem with the one in Jones' cell was it had fresh water leaking. There was a problem getting water into the bowl of the toilet. I'm not familiar with the blankets but I knew water blankets were being

-4-

used.  The only way you could have raw sewage on the cell floor was if the toilet overflowed.  In that case, the toilet would be shut off and J.D. would be called.

Jones was in three different cells.  *Defendants' Exhibit* 2.  To my knowledge, Jones did not file a grievance regarding the conditions under which he was confined.  *See Defendants' Exhibit* 3.  He never complained to me about the conditions in the jail.

Medical complaints, *Defendants' Exhibit* 5, are filled out by the inmates, passed to a deputy, and then given to the nurse.

I instruct employees what to do and I don't go down into the jail.  I do walk throughs.  I had no reason to examine the toilets.

**Tyson Dunn**

I'm a deputy with the Garland County Sheriff's Department.  I have worked there for seven years. I'm now a patrol deputy.  I worked as a detention officer for three years.  I worked in that capacity during Jones' incarceration.

Sometimes one of the toilets would be inoperable.  If a toilet broke down, we opened another cell for inmates to use the toilet.  There would be no time when an inmate did not have access to a toilet.

At night or during lock-down times, the cell would be left open.  Exceptions were when there was an a medical emergency, a fight, or there were officers in the cell.   I can't think of any incident when the inmates were locked in the cells without access to an operable toilet for more than an hour.

Some inmates used non-operable toilets.  I don't know why they did it.  Then the toilet had to be flushed.  Some guys did it as a passive/aggressive response.

Jones was a "problem child."  He used the toilet just to get back at me.  We used five gallon buckets of water to flush the toilets.  You poured it into the tank and it flushed down.  It is a fair statement to say we flushed the inoperable toilet once a day.  However, the inmates had access to operable toilets at all times.

At night time, we would leave a cell on local.  If we came in to flush the toilet using the bucket, after the operation was complete the cell door would be left open.  I don't recall Jones ever asking to leave the cell because the toilet was full of feces.  I do recall Jones saying he couldn't breathe because of heart problems.

I don't feel the jail was hazardous.  I was down there with the inmates for eight hours a day.

**J.D. Fladung**

I am the Garland County maintenance supervisor.  I've worked for the County for almost fifteen years.  I've been a supervisor for the last two.  There are ten buildings to maintain.  The GCDF is one of them.

In the jail, we have a stainless steel fixture bolted to the wall.  The commode is not removable.  It can't leak through the bowl because it is all welded by the factory.  The only way sewer would get on the floor is if the toilet over flowed.  We have had situations where a detainee has stopped up the toilet.

I get work orders from the jail on a daily basis.  I prioritize the work orders I receive.  In most cases, a work order is responded to within twenty-four hours.  Sometimes we have to wait for parts to repair the commode/sink unit.  The valve in the commode is obsolete.  It can take several weeks to get parts.  Sometimes the parts are on back order.  I try to get the units repaired as quickly as I can.  When I do order parts, I never order just one.  I order a quantity.

If a toilet had not been working for two and a half months, I would pull it out.  There could have been a toilet inoperable for a month.  A toilet in 1-B leaked for thirty days or more.  I've fixed the toilet in 1-B many times.  To work on a toilet, we take it out by unbolting it from the wall and taking it to the shop.

The practice of leaving cell doors open is not good.  Most of the time if a toilet is leaking it is from the back of the unit.  There are two plates on the back.  We never once have had a bowl break.  If a toilet is leaking, the jail puts blankets around to soak up the water.  The water fountain is at the top of the unit.  There is a hot and cold water button on the side.  Then the commode is on the bottom side of the unit.

-6-

I'm aware of the fact that jail personnel flush the inoperable toilets with five gallon buckets of water. I have probably worked on every toilet in there. In the mornings, I have gone in there and seen feces in a commode.

**Charles Waits**

I worked for the Garland County Sheriff's Department from July of 2006 to January of 2008. I was there when Jones was incarcerated. I was a jailer. I recall he had issues with his commode. It was a common practice to put the cell door on local if the toilet didn't work. The inmate could leave the cell by pushing a button. If the button didn't work, the cell door was left open. Inmates were not locked down overnight in a cell that had an inoperable toilet. No sewage leaked from the toilet. It was fresh water on the floor.

## II.  Discussion

The Eighth Amendment to the United States Constitution prohibits the imposition of cruel and unusual punishment. U.S. Const. amend. VIII. *See also Butler v. Fletcher*, 465 F.3d 340, 345 (8th Cir. 2006)(deliberate indifference standard of the Eighth Amendment applies to claims brought by pretrial detainees that prison officials failed to provide adequate food, clothing, shelter, etc.). In conditions of confinement cases, an Eighth Amendment violation is shown by proof of a serious deprivation of "the minimal civilized measure of life's necessities" and "offending conduct [that is] wanton." *Wilson v. Seiter*, 501 U.S. 294, 298, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991).

A prisoner alleging an Eighth Amendment violation must prove both an objective and subjective element. *See Revels v. Vincenz*, 382 F.3d 870, 875 (8th Cir. 2004)(*citing Wilson v. Seiter*, 501 U.S. 294, 298, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991)). "The defendant's conduct must objectively rise to the level of a constitutional violation by depriving the plaintiff of the minimal civilized measure of life's necessities. The defendant's conduct must also reflect a subjective state of mind evincing deliberate indifference to the health or safety of the prisoner" *Revels*, 382 F.3d at 875 (citations and internal quotation marks omitted).

In discussing the subjective state of mind required on the part of a detention center official, the Court of Appeals for the Eighth Circuit has stated:

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Randle v. Parker*, 48 F.3d 301, 304 (8th Cir. 1995)(*quoting Farmer*, 511 U.S. at 837)(internal quotation marks omitted).

Keeping these principles in mind, I turn to an examination of the evidence presented. The testimony established that there were occasions when a toilet in a cell was inoperable for a period of time until it could be repaired. Because of the age of the toilet-sink combinations, the parts were difficult to obtain and it sometimes took several weeks to get a part. Captain Mel Steed, Tyson Dunn, and Charles Waits testified that if a toilet was inoperable at least two cell doors were put "on local" which meant the doors are not locked. This allowed the inmates with the inoperable toilet access to a cell with an operable toilet. Despite this, Dunn testified that some inmates used the inoperable toilets.

Shelby Ingram and Jones testified that when they were housed together the toilet in their cell was inoperable the entire time and the sink leaked. James Charles also testified he had seen Jones' cell and knew the toilet was broken and water blankets were kept around it on the floor.

According to Ingram and Jones, they were locked in the cell at meal times, pill call, and at night. The remaining time, from approximately 7:30 a.m. or 8:00 a.m., until 9:00 p.m., they had access to the day-room and could use a toilet in another cell. To go into another inmate's cell, Ingram testified you had to have permission.

In contrast, Charles testified that at nighttime the practice was to leave the cell doors "on local" so everyone could use a bathroom. Most of the time, Charles testified all inmates had access to an operable toilet. Charles indicated there were six inmates who had to use the restroom in other cells.

-8-

Under the totality of the circumstances, I conclude Jones has failed to establish a serious deprivation of the "minimal civilized measure of life's necessities" and "offending conduct [that is] wanton." *Wilson v. Seiter*, 501 U.S. 294, 298, 302, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991). It is undisputed that except for meals, pill call, and emergency situations, all inmates had access to an operable toilet between the hours of 8:00 a.m. and 9:00 p.m. I find persuasive the testimony of Charles that the practice at nighttime was to leave cell doors unlocked so inmates had access to an operable toilet. Charles is not currently incarcerated in the GCDF, has no connections with the Defendants, and nothing to gain by his testimony.

Clearly, there are problems with the toilet-sink combinations utilized at the GCDF. However, the evidence establishes that when a toilet was inoperable, Defendants attempted to deal with the situation by placing work orders to have the toilets repaired, giving the inmates access to operable toilets, and manually flushing the inoperable toilets once a day. There is simply no evidence that the Defendants were deliberately indifferent to the risk of harm posed by the inoperable toilets.

### III.  Conclusion

I therefore recommend that judgment be entered in Defendants' favor and this case be dismissed with prejudice.

**The parties have fourteen (14) days from receipt of this report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

**DATED** this **5th day of May 2010**.


/s/ Barry A. Bryant
HON. BARRY A. BRYANT
UNITED STATES MAGISTRATE JUDGE